THE PEOPLE v. MARY BODINE.

Challenge to jurors for principal cause, and to the favor. Mode of trial. What bias disqualifies.

Circumstantial evidence; what is the weight to which it is entitled; the different kinds of it, and the rules governing the reception and efficacy of the different kinds.

When and how far the *onus probandi* rests upon the accused to prove facts peculiarly within his knowledge, where the absence of such proof justifies an adverse presumption.

The weight to which evidence of good character is entitled, and what is justly to be inferred from its absence.

THE prisoner was indicted in Richmond county for the murder of her brother's wife, and of his child; for arson of his inhabited dwelling-house; for burglary, and for receiving stolen goods.

She was tried on one of the indictments for murder, in the county of Richmond; and the jury, not agreeing, were discharged.

Another attempt was made to try her on the same indictment, in that county; which failed, because of the impracticability of obtaining an indifferent jury.

The indictments were then all removed into the Supreme Court, and by that court sent down to the New York Circuit to be tried.

And now, at this day, March 20, 1845, the prisoner was placed at the bar, to be tried on the indictment for the murder of Emeline Houseman.

She, by her counsel, objected, that the said court had no authority to try the issue, upon the ground that this cause had been removed from the Oyer and Terminer of the county of Richmond to the Supreme Court by a certiorari issued on the part of the prosecution and allowed by the circuit judge of

the first circuit; that the allowance of the said writ of certio-
rari by a circuit judge was illegal and void, and that the said
issue was not depending in the Supreme Court. Whereupon
the district attorney of the county of Richmond produced and
filed in open court a certified copy of a rule of the Supreme
Court, in the words and figures following, to wit:

### SUPREME COURT, JANUARY 6, 1845.

| | |
|---|---|
| THE PEOPLE, v. MARY BODINE. | *Indictment for the murder of Emeline Houseman.* |
| THE SAME, v. THE SAME. | *Indictment for the murder of Ann Eliza Houseman.* |
| THE SAME, v. THE SAME. | *Indictment for burglary.* |
| THE SAME, v. THE SAME. | *Indictment for receiving stolen goods.* |
| THE SAME, v. THE SAME. | *Indictment for arson.* |

L. C. CLARK, *District Attorney.*

On hearing L. C. Clark, district attorney for the people, on
motion to change the place of trial of the above mentioned
indictments, and on hearing Clinton De Witt, Esq., of counsel
for the prisoner—Ordered, that the place of trial of each of the
above mentioned indictments be changed from the county of
Richmond to the city and county of New York, and that they
be tried in the city and county of New York, and that a sug-
gestion to that effect be entered upon the roll, and that the
body of the said Mary Bodine be committed to the custody

of the sheriff of the city and county of New York until the said indictments have been tried or disposed of according to law, or until the further order of the court.

*The Circuit Judge* overruled the objection, on the ground that the order of the Supreme Court was conclusive on him, to which the prisoner's counsel excepted.

The first juror that was called was challenged by the prisoner to the favor on the ground of bias, in having formed or expressed an opinion as to the guilt or innocence of the prisoner.

The court appointed two of the members of the bar then present in court as triers, and they were sworn as follows:

"You shall well and truly try whether A B (the juror challenged) stands indifferent between the people of the State of New York and Mary Bodine, the prisoner at the bar, and a true verdict render, according to evidence."

The juror having been found indifferent, he was sworn in chief. The clerk having directed the prisoner to arise from her seat, which was within the bar, by the side of her counsel, said: "Prisoner, look upon the juror. Juror look upon the prisoner." He then administered to the juror the following oath: "You will well and truly try, and true deliverance make, between the people of the State of New York and Mary Bodine, the prisoner at the bar, whom you shall have in charge, and a true verdict render, according to evidence. So help you God."

The next juror that was drawn was also challenged to the favor for the same cause.

The two former triers, and the juror already sworn in chief, were then sworn as triers.

After the testimony had been taken, and the question of indifferency of the juror challenged had been submitted to the triers, and they had retired for deliberation, they returned into court and inquired whether a majority could render a verdict, as they could not agree upon a unanimous finding.

*Circuit Judge:* I know of no precedent on this subject, nor am I aware that the question has ever arisen for decision. I can only be governed by the general principle affecting all trials by jury, and that requires unanimity. I shall therefore require a unanimous verdict.

*Whiting,* for the prosecution, suggested a difficulty in case the triers should not finally agree, and be discharged. New triers must be sworn to try the same question, and as the juror already sworn in chief must be one of them, it will be thus in his power to force his views of the case into the ultimate decision of the question.

*Circuit Judge:* I perceive the difficulty, but it is not, as I understand, imperative that he shall in all cases be one of the triers. But it is unnecessary to decide that point until the question shall arise.

The triers agreed on a verdict that the "juror was not indifferent."

After several other jurors had been challenged and set aside (the whole number thus tried before a jury was impaneled was 285), David Board was called and challenged to the favor for the same cause.

He was sworn as a witness on the challenge as follows: "You will true answers make to such questions as shall be put to you touching your competency as an impartial juror between the people of the State of New York and Mary Bodine, the prisoner at the bar."

He testified that he had read something of the case in the papers. They implicated the prisoner. If the accounts were true, they made an impression on his mind as to her guilt or innocence. He had not formed an opinion as to the truth of what he had read, but he supposed they were true.

Q. Upon the supposition that those statements were true, did you form an opinion as to her guilt or innocence?

A. I don't know that I could form an opinion, unless I knew whether they were correct or not.

The last question having been repeated, the juror answered "yes."

Cross-examined: I did form some opinion as to the truth or falsity of the statements. I don't know that the state of my mind has changed.

Q. by Triers. I formed some general opinion as to the truth of these statements. I formed an opinion as to her guilt or innocence.

The circuit judge charged the triers that, in order to form such an opinion as disqualifies, two things were necessary — a belief as to the truth of the facts upon which the opinion was founded, and a conclusion founded on such belief. To this part of the charge the prisoner's counsel excepted.

The judge further charged the triers: The two questions are: First, has the juror now an opinion as to the truth of the facts he read or heard? Second, has he an opinion as to the guilt or innocence of the prisoner? A mere faint impression, founded on either personal knowledge of the circumstances, or on a relation of them by those who have such knowledge, or on a mere rumor or report, is not such an opinion as disqualifies. It must be a fixed and decided opinion, such as it will require evidence to remove. To this part of the charge the prisoner's counsel excepted.

The counsel for the prisoner requested the circuit judge to charge the triers, as separate propositions:

1. That the formation of an opinion as to the guilt or innocence of a prisoner, is conclusive evidence of bias;

2. And this, though the juror swears he has no bias;

3. And although he swears the opinion once formed has been removed;

4. An opinion as to guilt or innocence, founded on hearsay or newspaper reports of the circumstances of the case, is such a one as disqualifies, even though the juror formed no belief as to the truth of the hearsay or reports.

The court charged as requested, on the first three proposi-

tions, adding the remark, as to each proposition, "if the opinion be such a fixed opinion as I have already described in my charge."

The court declined to charge as requested in the fourth proposition. To which qualification of the first three propositions, and to which refusal to charge as requested on the fourth proposition, the prisoner's counsel excepted.

The counsel for the prisoner requested the court to charge the triers, that any impression entertained by the juror as to the guilt or innocence of the prisoner, disqualifies him from serving as a juror. The court charged that "such is the law, if by 'impression' is meant such an opinion as I have already described," and refused otherwise to charge. To which refusal the prisoner's counsel excepted. And the challenge, having been duly submitted to the triers, they found the same true, and the juror was set aside.

Samuel Bailey was called as a juror, and after challenge for favor, testified as follows: I have heard or read statements of the circumstances relating to the alleged murder of Emeline Houseman, deceased. They made no impression on my mind as to the guilt or innocence of the prisoner, because I never believe what I hear until conviction.

Q. Assuming those statements to be true, did you then form an opinion as to her guilt or innocence?

To this question the counsel for the people objected, and the court sustained and allowed the objection, because such a mode of inquiry, though proper on a cross-examination, was not so on the direct examination, because it was assuming as true, what the witness had not testified to, but had testified the contrary, and because he had already answered that he had formed no opinion. The prisoner's counsel excepted to the decision.

He was then asked the following question: Did you, then, assuming those statements to be true, form an opinion as to her guilt or innocence? To this question the counsel for the people objected, and the court, for the same reasons, allowed the objection. To which decision the counsel for the prisoner excepted.

Q. If the evidence should support the circumstances which you heard and read, have you a belief as to the guilt or innocence of the prisoner? To this question the counsel for the people objected, and the court sustained the objection. To which decision the prisoner's counsel excepted.

Q. If the circumstances which you have heard or read be true, have you now an opinion as to the guilt or innocence of the defendant?

A. I have no opinion until I hear the evidence.

The prisoner's counsel repeated the question. The court refused to allow it to be put again. To which decision the counsel for the prisoner excepted.

The triers found the challenge not true; and the prisoner, by her counsel, peremptorily challenged the juror.

Joseph B. Flanderau was called and challenged for favor by the counsel for the prisoner. Having been sworn, the juror testified as follows: I have formed no opinion as to the guilt or innocence of the prisoner. I read statements of the circumstances of this case, at the time of the arrest of the prisoner, and some portion of the evidence on the last trial. These statements implicated the prisoner in the murder. My mind was not made up whether the statements were true.

Q. If the evidence should support the statements which you read, have you an opinion as to the guilt or innocence of the prisoner?

This question was ruled out by the court, for the reason that the juror, having already testified that he had formed no opinion, could not, on his direct examination, be thus cross-examined, and a question could not properly be asked, resting on a supposed case, which might or might not be made out.

*The Prisoner's Counsel* excepted.

He testified that he read the proceedings on the last trial, from day to day, and saw the evidence was purely circumstantial, and remarked that upon that species of evidence he never could be instrumental in convicting.

On his cross-examination he said he could not convict on circumstantial evidence, however strong; he had conscientious scruples against convicting on such evidence, in capital cases. If the case was proved by eye witnesses he would convict, and not otherwise.

The prisoner then withdrew the challenge, and the juror was challenged by the counsel for the people, for principal cause—first, on the ground that the juror will not believe legal evidence; second, that he has conscientious scruples against finding a verdict of guilty in a capital case on any evidence short of eye witnesses to the fact.

The prisoner, by her counsel, demurred to the challenge, and assigned for cause—first, that the causes of challenge were properly only causes of challenge to the favor, if at all, and triable by triers; second, that the causes of challenge assigned are not, nor are either of them, good ground of objection to the juror. The counsel for the people joined in demurrer.

*The Circuit Judge:* I have no hesitation in overruling the demurrer and allowing the challenge, and cannot help expressing my surprise that so many of the jurors drawn should express the same opinion. They surely cannot know what they say when they avow their inability to convict on circumstantial evidence. It is a strange delusion which has entered their minds, and they cannot be aware that a great majority of the acts of their whole lives are based upon such evidence, and that they are every day giving weight to it, in all the most interesting and important events that relate to them. They must be mingling in their thoughts circumstantial and hearsay evidence together, and not distinguishing one from the other. But, be that as it may, this challenge must be allowed, because the demurrer admits that the juror will not believe legal evidence.

The counsel for the prisoner, on an affidavit that the demurrer had been interposed in good faith, moved for leave to withdraw the demurrer and plead to the challenge.

*The Circuit Judge:* It is not a matter of course, but in the discretion of the court, to grant such a motion. I see no propriety in granting it in this case. The juror has already sworn as to his notions, and clearly shown that he is unfit to be trusted with a share in the administration of justice; and a trial of the question of fact will only lead to a repetition of his absurdities. Besides, to grant the motion would be virtually allowing the prisoner to appeal from the decision of the court to the triers, and that cannot be tolerated. The motion must be denied.

At this time only three jurors had been sworn in chief. When Buckley was set aside two of those who had been sworn in chief suggested to the court that they also had conscientious scruples against convicting on circumstantial evidence.

*Whiting,* for the prosecution, claimed the right now to challenge those jurors on that account.

*Graham, contra,* objected that it was too late.

*The Circuit Judge:* It has always been allowable for the prosecution to challenge a juror after he is sworn, for a cause arising after he is sworn. It would seem that this cause has thus arisen, for it flows from the juror's own suggestion immediately after the last case, and would seem to have been produced by the discussions then had. I will allow the challenge to be now put in.

William Lintz, one of those jurors, was then challenged for favor by the prosecution, for the following causes: First, that he will not credit legal evidence, and, second, has conscientious scruples against convicting, in a capital case, on any evidence short of that of an eye witness to the fact. The juror, being sworn as a witness on the challenge, testified that he would not convict in a capital case upon circumstantial evidence alone, and would not, on any evidence short of that of an eye witness; but, on his cross-examination, he said that if the circumstances were so strong as to leave no other

hypothesis but guilt, he would believe the testimony, and convict.

*The Circuit Judge,* in charging the triers, said that it would be proper for him to dwell somewhat at length upon the considerations which this challenge presented, for it was important, at the earliest practicable moment, in this case, to drive so great a delusion from the minds of the jurors.

The fear that seems to operate in producing this hallucination, is that of being deceived. There is no kind of evidence — direct, positive, circumstantial or presumptive, that may not deceive us.

It is an omniscient eye, alone, that can effectually guard against error. Finite minds are always liable to be deceived, whatever may be the character of the evidence on which their judgment is to be formed. Whenever, therefore, any one talks of disregarding any kind of evidence, because it is possible that it may lead him into error, he casts to the wind the immortal mind which the Creator has given him for the very purpose of reasoning and drawing just conclusions.

Evidence is to be regarded as of two kinds, and each is liable to the danger of which I have spoken. One class is direct or positive evidence, where, as in this case, we will suppose some person shall come forward and say that he saw the prisoner at the bar commit the murder for which she is now indicted; that he saw the blow struck, saw the deceased fall, saw the blood flow, and witnessed the departure of life. That would be positive and direct evidence of the crime, and it would be folly for you to tell me that because men have said these things, or sworn positively, directly in such matters, and sworn falsely, too, that therefore you will not believe such evidence.

In weighing direct evidence, many things are to be regarded, such as what is the capacity of the witness? Was he able to see and to understand the transaction? Is he able now to explain what he saw and understood? Was he attentive, or was he careless? Is he prejudiced, or is he dispassionate and calm? Has he some sinister motive that may lead him to fabricate

that which he did not see? All these circumstances are to be weighed, and all suggest various matters that may eventually impair the value of even direct and positive evidence. We thus appeal to circumstantial evidence to test the degree of credit to which that which is direct may be entitled; and it is universally true, in court and out of it, that we never take positive evidence as to any fact, without looking for circumstances either to support or to contradict it. It frequently occurs that direct evidence, which is much more easily fabricated than circumstantial, is to be contradicted by circumstantial, and circumstances are often called upon to aid in doing away with the effect of fabricated direct evidence. I will give you a familiar instance to illustrate my meaning: A will is produced by a party, bequeathing to him certain lands that had belonged to one of his ancestors. Witnesses are brought forward, who swear positively and directly to the fact that the will was executed by the party whose signature it bears, and executed at a certain time; that they were present when the ancestor signed it and affixed his seal, and that they signed their names at the time. The chain of direct evidence is complete. One of the witnesses swears that when the ancestor executed the will he put a sixpence in the wax of which the seal was composed, for the very purpose of having it identified. The seal is broken in court, and there, indeed, is the sixpence; but the coin is of the reign of George the Third, while the will is dated in the time of George the Second.* Who could for a moment doubt that this circumstance would be of infinitely greater value than the direct evidence? It would betray the whole fraud and forgery in the case. Such things show the value and importance of the evidence offered by circumstances, even when there is direct evidence in the case.

The other class is circumstantial evidence, which is of two kinds, one called certain, and the other presumptive. Certain circumstantial evidence is when a conclusion necessarily follows from the facts. For instance, to take a familiar illustration:

---

* This supposed case is taken from Miss Edgeworth's novel, "Patronage."

We find an apple lying upon the ground; we know—it is certain—there can be no doubt about it—that that apple once grew upon a tree; that it did not grow upon the ground. The conclusion necessarily follows, that that apple came from some tree. So, to-day, who has seen the sun rise? Clouds have obscured the sky since early dawn, and yet, if the whole world should come before you, and tell you that the sun has not risen this day, and swear to it, would you believe it? You judge from the circumstance that the sun does rise every day, and that we have no light by day except that which the sun gives; and although these clouds have obscured it, and no man can say he has seen it to-day, yet the conclusion necessarily infallibly follows, that the sun has risen, and you would believe it though all the world should depose to the contrary. That is circumstantial evidence, and it is called certain when the conclusion thus infallibly flows from the circumstances. Shall we say, now, that we do not believe this kind of evidence? Will we say that the sun has not yet risen; that we are in midnight? We should be, indeed, in a mental midnight if we disregarded such evidence as that. And yet, how often do we hear it said in the world, we would not believe circumstantial evidence. Take an instance—one with which we are familiar in our books. The question arises, was a death the result of suicide, or was it murder? The difficulty was to ascertain whether there had been any person present at the time the death was inflicted? There was found upon the left arm of the deceased, the mark of a bloody left hand. It could not have been her own. There was certainty about that. The fact was thus, by circumstances, established that somebody besides the deceased had made this mark. That was a certain conclusion flowing from these circumstances.

Therefore it is that judges say "circumstances cannot lie;" and, whatever counsel may say in the way of argument, they err widely if they tell you the contrary. Circumstances cannot lie. Is there any lie in the sun being now, at high noon, in the heavens and throwing light upon us? Was there any lie about the fact that the apple did once grow upon a tree?

Was there any lie in the conclusion that somebody besides the deceased had put a bloody left hand on the left arm of that body? No; these circumstances did not lie. The power of lying belongs to animate man, not to inanimate nature. But there is a danger — it is the danger of erring in the conclusions we draw from circumstances. We may reason falsely. Our prejudices or weakness may lead us to false conclusions. When, therefore, we establish the fact, we must take care that the conclusion we draw is a truthful one, and then there is no danger. But the moment a jury go beyond the line where the conclusion necessarily follows, they are in danger of giving birth to a falsehood, and hence the necessity of great care and caution.

There is another kind of circumstantial evidence known, and that is the kind which may principally govern us in this case, and that is presumptive circumstantial evidence — not that in which the conclusion necessarily follows, but that in which the conclusion is obtained by a process of reasoning, and it is in regard to that kind of evidence that the danger of erring is greatest. To illustrate my position, let me refer you again to the case of the bloody mark of the left hand on the left arm. That was certain to this extent — it showed that somebody had been there, but the question was still undecided, was it suicide or murder? In order to arrive at a conclusion on that point, we have yet to know that somebody was present at the time the death was inflicted. Some one might have stepped in while the suicide was in his last moments, or might have been present even when the act was perpetrated, and made the mark in an attempt either to aid or prevent the deed. The conclusion, therefore, that any person was present at the time of the death, and participating in it, did not necessarily flow from the mark being there, but must be arrived at by a process of reasoning, and in that reasoning there might be error. Take also this case, that of hearing your front door bell ring. You sit in your parlor and hear it. You are perfectly satisfied that some one is ringing at the door. A man is found with his hand on the knob of the door — would you doubt that he rang

the bell? Not at all. You judge from that circumstance, and that the bell cannot ring itself, that it was rung by the person standing at the door. You ask the man, "What do you want?" He replies, "Nothing." "You rung my bell." "No!" Well, you find from some one inside, in whom you have perfect confidence, that no one in the house touched the bell. Besides, you are told by a witness in the street, in whom also you have perfect confidence, that he saw the person on the steps ascend them and put his hand on the wire, and that no person but he had been there. Would you, in that case, believe the man at the door? Would you credit his denial? You have the positive evidence on his part that he did not ring, but all these circumstances tell you that he did. In this case you would doubtless take the circumstantial evidence and reject the positive. You arrive at the conclusion by a process of reasoning, founded on circumstances; and, if fairly conducted, that process, as I have remarked, will not be likely to deceive you. The man can and may deceive you. In a case of that kind, who is there that would not give credence to the circumstantial evidence rather than to the positive and direct? I mention this familiar instance to you, because you can thus see that in most of the acts of your lives you are governed by circumstantial evidence, and from the very nature of things it must be so.

Gentlemen, it has been well said: "It is not likely that so many beams of light should issue from the chambers of heaven for no other purpose than to lead us to a precipice. Probable arguments, and prudential motives are the great hinges of human action."

This kind of proof, to which I have been calling your attention, is that which, from necessity, we are obliged most to use in criminal cases, because, as you have heard, visible proof is not to be expected from works of darkness.

From these suggestions, gentlemen, you will perceive that there is a species of circumstantial evidence from which conclusions may be drawn as certain, as unerring, and as infallible as from the most satisfactory direct evidence. And that there

is a species which does not possess those characteristics, but, depending for its conclusions upon a process of reasoning, is much more liable to error. To guard against that error, certain rules have been established by the wisdom and experience of the past. These rules have existed for many years. They are rules which the wisdom, and thought, and experience of ages have sanctioned, and we must be careful how we unsettle any of them, because upon their continuance may depend the protection of all that is valuable to us as members of a civilized community. One is, that a higher degree of certainty is necessary in criminal than in civil cases, because of the more serious and irreparable nature of the consequences flowing from the decision of the former. For instance, you are 'perhaps trying whether I executed a note of hand. Some one swears that he is familiar with my handwriting, and that the note is mine. You think it is so from this evidence, and decide accordingly. It is not an irreparable injury, even if you decide wrong. In that case a probability may enable you to decide, but in a criminal case there must be an unbiassed moral conviction of guilt, *not* a probability only.

Another rule is this: The evidence must exclude, to a moral certainty, every other hypothesis but that of guilt. If the facts that may be proven can be reconciled with the belief or supposition that the prisoner is innocent — that somebody else committed the guilty deed — then that hypothesis which the law requires will not exist in the jurors' minds. To illustrate this matter — for I find that these illustrations are, in my own mind, more effective than abstract propositions — take the instance stated by counsel, of the servant girl indicted for the murder of her mistress. It was proved that she was alone in the house with the murdered woman — there were no signs about the house that it had been broken into — and from the fact that she had all the opportunities of committing the deed, it was concluded that she was the guilty person. One would have, indeed, supposed that every hypothesis but that of guilt was excluded. And yet in that very case there was another hypothesis that was nearer the truth even than that which the

The People v. Mary Bodine.

jury had formed. A man had entered the house by an open window, to which he obtained access by means of a plank thrown across from the opposite side of an alley, and after he had perpetrated the murder he removed every trace of his entrance. The conviction in that case was therefore held to be wrong, because there was another hypothesis which the evidence did not exclude.

There is another thing to be taken into account—that circumstances are sometimes fabricated by innocent persons falsely accused. Take the case of the uncle who was heard chastising his niece severely—she cried out "You will kill me." She was afterward missing—nobody knew where she was. The uncle was strongly interested in her death, because he would have inherited her estates. He, alarmed at the circumstantial evidence against him, endeavored to save himself by dressing up another child and presenting it as his niece. That very fact was, as might have been expected, taken as strong evidence of his guilt. The man was convicted, and afterward the child returned home, having run away from his severity. There can be little doubt that that fabrication of evidence by him operated most strongly in the minds of the jury in convicting him. Fabrication is also sometimes resorted to, by the really guilty, to ward off suspicion from themselves.

Take the instance of the man found on the road with the stolen horse. He was found alone with the horse, and could not give any satisfactory account of the manner in which it came into his possession, and on that evidence he was convicted. But it turned out that the real thief, finding himself hotly pursued and in danger of being overtaken, encountered this man on the highway, and asked him to hold his horse while he stepped into the neighboring field, and thus he escaped by fabricating evidence against another. The possibility of circumstances being thus fabricated, both by the innocent and the guilty, is therefore to be taken into consideration.

Another rule is, that the supposition of guilt must flow naturally from all the facts, and be consistent with all of them.

It must be no constrained result, and if any one of the facts is utterly inconsistent with the idea of guilt, it breaks the chain, and bars the conclusion which might otherwise naturally flow from the other circumstances. As in the case of the servant girl, accused of poisoning the family in food of which she partook as freely as any. The danger which she thus unnecessarily incurred was so inconsistent with the supposition of her guilt, as of itself to be regarded as destructive of the conclusion which naturally flowed from the other circumstances of the case.

Another rule is, that in cases of doubt, it is safest to acquit. In the first place, all persons are to be presumed innocent until proved guilty; and, in the next place, it is better to let the guilty escape than to punish the innocent.

Guided by these rules, and with these safeguards, it is safe, it is usual, and it is necessary, in the administration of justice, to rely upon circumstantial evidence, and not only upon that which is certain, but that which is presumptive.

It is safe, when no person has an interest, either to convict or acquit, sufficiently strong to induce the fabrication of evidence, and when we can bring to the task of drawing the conclusion, a calm, and enlightened, and unbiassed judgment.

It is usual, not only in the courts of justice, but in the every-day concerns of life; and though, in both respects, we may sometimes be deceived, yet not more frequently than by false direct testimony. And particularly is it usual in criminal trials, where the inducement to conceal the evidence of guilt is so strong and overpowering.

It is necessary, because without it the innocent, the unwary, the confiding, would be deprived of the great instrument of their protection, and the artful, the designing, and the depraved, would be furnished with an impunity for their depredations upon society, which would soon overthrow the supremacy of the law. It is indispensable to the very existence of society that the magistrate should found many of his determinations upon circumstantial evidence. A vast majority of the ordinary transactions of life have this foundation, and

The People v. Mary Bodine.

none other.   And it would be, indeed, a misfortune if the popular error which has so frequently and so strongly manifested itself during this trial, and which I have endeavored to combat, were to prevail in our courts of justice, merely because absolute certainty could not be attained.

"With the wisest laws, and with the most perfect administration of them, the innocent may sometimes be doomed to suffer the fate of the guilty, for it were vain to hope that from any human institution all error can be excluded."

But this danger is as great, at least, when the conclusion is founded upon direct, as when upon circumstantial evidence. Will you, therefore, reject either species of evidence?  If so, which will you reject, and where will you stop?  And what is to save from the moral wreck to which you are invited, your knowledge of the physical world, or your belief in the divine religion you possess?

I have dwelt long upon this topic, gentlemen, but not too long, if I have driven from your minds the impression which seemed to have settled there, that any man in his senses would not credit circumstantial evidence; if I have dispelled an error, strong in popular prejudice, and founded on imperfect knowledge, but most dangerous in its effects, and alarming in its consequences.

The triers found the juror indifferent and the challenge against the other juror was withdrawn.

William Gardner, next called as a juror, was challenged for favor by the prisoner's counsel, and testified that he had formed no other opinion than that if the prisoner was guilty she ought to be punished, but that he was now biassed against her from hearing so many people called there as jurors say they had formed an opinion.

*Circuit Judge:*  Before you came here to-day, had you any definite opinion of her guilt or innocence?

Which was objected to by the prisoner's counsel, and an exception taken.   The juror answered in the negative.

*The Counsel for the Prisoner* requested the court to charge the triers that if they believed that a bias existed in the juror's mind, it was immaterial how or when it was formed.

*The Court* charged that they were to inquire whether the juror had a disqualifying opinion before he came to court, and that such a bias as he had described, produced by the causes he had mentioned, ought not to disqualify him, and refused otherwise to charge the triers, to which charge and refusal the prisoner's counsel excepted.

Daniel M. Watkins, called as a juror and challenged for favor, testified that after he had been summoned as a juror in the case he had expressed an opinion as to the prisoner's guilt.

*The Court* said that was enough to set him aside, but he must show cause why he should not be punished as for a contempt in thus attempting to avoid the performance of his duty.

William M. Lent, called as a juror, was challenged by the prosecution for principal cause, for having conscientious scruples against inflicting the punishment of death. He testified that he had such scruples, but that if he was sworn as a juror he should render a verdict according to the evidence, whatever the consequences.

*The Court* overruled the challenge and directed the juror to be sworn as such.

He declined taking the oath because it would place him in a position which might compel him to be instrumental in taking the life of a fellow creature, and that he could not do.

*The Court:* I have no option in the case. It having been adjudged, on due trial, that your belief is not such as to disqualify you from serving as a juror, it is my duty to direct you to be sworn, and to punish you for a contempt if you per-

sist in your refusal. Such was the course pursued by the late Judge THOMPSON in the United States Circuit, and however painful it may be, the line of my duty is too plain for me to swerve from it.

The juror, continuing his refusal, was set aside by consent.

James McMillan, called as a juror and challenged for favor by the counsel for the prisoner, testified as follows: I have not formed or expressed an opinion as to the guilt or innocence of the prisoner. I read partially the accounts of the last trial.

Q. Did what you read produce any opinion as to whether the prisoner was guilty?

A. It did, rather unfavorably. It has been somewhat removed.

Q. By what?

A. I can't say. It does not exist now.

*The Court* charged the triers the same as in the challenge of David Board; and the counsel for the prisoner requested the court to charge the same as was then requested, which the court refused to do. The same exceptions were then taken to the charge and to the refusal to charge.

The triers found the challenge not true, and the counsel for the prisoner challenged the juror peremptorily.

Roe Lockwood, called as a juror, and having been challenged for favor by the counsel for the prisoner, testified as follows: I have formed impressions as to the guilt or innocence of the prisoner, and expressed them, but don't recollect distinctly when, or to whom. My mind is not what it would have been had I not read what I have read.

Cross-examined: It would require strong counteracting testimony to put my mind back where it was.

Q. [By the court.] Derived from what?

A. From what I heard and read of the statements at the time of the arrest, and from reading some portion of the testi-

mony on the last trial. My impressions are not so strong as to justify me in convicting or acquitting on what I now know.

*The Court* charged the triers that the last remark of the witness would make him a good juror.

To which charge the prisoner, by her counsel, excepted.

After the charge was given, and the exception taken, and before the triers rendered their verdict, the juror added, in explanation of his testimony, that he has conversed about this matter in his family, and has no doubt he has expressed a decided opinion, but does not now recollect any particular occasion on which he has done so. The counsel for the prisoner then requested the court to charge the triers that this last evidence of the juror rendered him incompetent. The court refused so to charge, but on the contrary charged the triers that it was not sufficient to exclude him; to which refusal, as well as to the charge of the court in that respect, the counsel for the prisoner excepted.

Peter E. Coon, called as a juror and challenged for favor by the counsel for the prisoner, testified as follows: I read a slight account about this case about a year ago.

Q. Did what you read, or heard, make any impression on your mind as to the guilt or innocence of the prisoner?

A. What little I read I supposed to be as true as newspaper reports generally. I formed no opinion as to the guilt or innocence of the prisoner, nor have I now such an opinion.

Q. Was your mind, then, or is it now, free from any impression or bias as to the guilt or innocence of the prisoner?

This question was ruled out by the court, on the ground that it had been substantially answered before, and the prisoner's counsel excepted to such ruling. The triers found the juror indifferent, and the challenge not true.

John McColgan was called as a juror, and challenged for favor by the prisoner's counsel, and testified as follows: I have read part of the last trial of this cause.

Q. Did what you read produce any impression on your mind as to the guilt or innocence of the prisoner?

*The Court* decided that this question was improper, and the counsel for the prisoner excepted to the decision.

Q. [By the court.] I formed no opinion as to her guilt or innocence.

The triers found the challenge not true.

After a large number of jurors had been set aside, or challenged for favor by the prisoner's counsel, James M. Tice, having been found by the triers indifferent, was sworn as a juror to try the cause. Over three hundred persons in all were called as jurors, and either set aside on principal challenges, or challenges for favor. The prisoner had challenged only thirteen jurors peremptorily, and at the time the twelfth juror was sworn, she had remaining the right to challenge seven jurors peremptorily.

The jury having been impaneled and sworn, the trial of the cause proceeded.

*L. C. Clark*, district attorney of Richmond county, then moved the court that the jury should be allowed to visit the premises where the murder was alleged to have been committed, on the ground that their doing so would be quite necessary to a proper understanding of a great portion of the testimony, which would consist of many circumstances connected with the situation of the house in which the deceased lived, the surrounding buildings, and the roads in the vicinity.

The motion was granted, and on the return of the jury to their box, Clark opened the case for the prosecution.

The trial continued a number of days, and during the whole of it the jury were kept together, under the charge of constables, who were from time to time sworn as follows:

"You will take charge of this jury, and furnish them refreshments, under the direction of the court. You will not speak to them yourselves, nor suffer any other person to speak

to them, on the subject-matter of this trial, and you will return them into the court at the hour to which it shall adjourn."

From the testimony given on the trial, it appeared that on the evening of December 25, 1843, at about nine o'clock, some persons passing along the road in front of the house of the deceased, discovered a thick smoke coming out of the kitchen chimney. They passed on a few rods, and stopped at a tavern in the village. In about fifteen minutes it was discovered that the house was on fire, the fire having broken out in the rear of a wing attached to the house, which was used as a kitchen and sleeping apartment by the deceased. The neighbors quickly assembled, and by water drawn from the well extinguished the fire. It was known that Captain Houseman, the husband of the deceased, and brother of the prisoner, who was a seafaring man, was then absent on a voyage at sea, and it was supposed that his wife had gone on a visit to some of her relations, to keep the holidays, with her only child, and that the fire was the result of accident.

But upon stirring among the rubbish, to see whether the fire was entirely extinguished, a body was discovered, which was at first supposed to be that of a dog, or a sheep, but upon being removed was recognized to be the deceased. Search was then made for the child, and its body was found in the rubbish, still more consumed than that of its mother. It was still supposed that the fire had been accidental, and as smoke had been seen to issue from the chimney, that the fire had caught from the stove in the room. But, upon examining the stove, it was found that it was warm only on its outside; that inside it was cold, and that the ashes in it were cold, as if no fire had been in it for many hours. It was also observed that the fire had been principally in one corner of the room, at the greatest distance from the stove and the chimney, and in which the bed of the deceased had usually been placed; and it seemed as if the fire had been kindled directly under the bed where the deceased and her child would have been if they had retired to rest, and that it had been kindled by means of rags, and

other things not usually kept there. It was also discovered that the outer door of the kitchen had not been locked or fastened, as it had been the custom of the deceased (who was a timid woman) always to fasten it. The inside of the door had been very much marked with the action of the heat, but those parts of the sliding bolts, which would have been exposed to the heat if the door had been fastened, were free from marks, while those parts which would be exposed when the door was not fastened, had the same marks of heat that the door had. So, too, it was found that the end of the bolt of the lock had similar marks, while the sides of the bolt, which would have been exposed to the heat if the door had been fastened, were not marked. So, too, a wooden bar, ordinarily used as a fastening to the door, was found in the yard, not charred, while that part of the door, which would have been covered by the bar, was as much marked as the other parts. Upon further search it was found that the house had been robbed of a watch, some silver ware, and other articles of value, not bulky. It was then believed to have been the result of design, but no suspicion attached to the prisoner for several days. In the mean time, a post mortem examination was made. From that it appeared that, in Mrs. Houseman's case, the back part of the head was very much burned, part of the skull wanting, and the brain baked by the action of the heat, the muscles of the neck nearly all detached on one side, the bones of the chest fractured, the integuments consumed, and the bones turned into the thorax; one of the arms separated from the body; on that arm, near the wrist, a black silk handkerchief had been tied tight around it and fastened with a sailor's knot, and under that the flesh was not as much burned as in adjacent parts of the arm. On the left arm, both bones of the forearm were broken, and one of the bones was white and clear, the other blackened by the heat; near the fracture was a ragged wound made by some blunt instrument, and, on cutting into it, extravasated blood was found. The physicians differed in opinion whether these fractures were produced before or after the fire. The upper part of the bowels was destroyed by fire, but the

lower part of the body not much acted upon by the heat. The body was examined to ascertain whether it had been violated, but no signs of it were found.

The body of the child was much more destroyed. The head was all gone except the base of the skull and the lower part of the brain, and the limbs and body so much destroyed and disfigured as hardly to look like a human being. A piece of the child's skull was found among the rubbish where the fire had been. There was on it part of the scalp and hair, not burned, though the edges of the bone had been acted on by the fire. In the cavity of the bone there were remains of brain, and some blood. The physicians were in doubt whether this piece of skull had been removed from the head before the fire or before death. While they could not imagine how the fire could have consumed all the rest of the head and leave this part, so they thought the bone and scalp not being burned, and the blood found in the cavity of the bone, indicated that it had been separated during life.

They thought, also, that the extravasated blood on the left arm of the mother indicated that it had been broken by a blow during life; and from the fact that there were no blisters on her flesh, and that some parts of her body were not acted upon at all by the flames, so that it must have lain still while the fire was burning, they concluded that she must have been dead before the fire.

They did not examine for evidences of strangulation or suffocation, and could express no opinion as to the cause of her death.

It appeared, also, in evidence, that the prisoner was a married woman, but had been separated many years from her husband, and, having been left destitute by him, had returned to her parents to live, with her two children, a son and a daughter. Her father's house was near her brother's, being separated only by a garden between them; and she, with her daughter, resided with her parents at the time of the fire, which occurred on Monday evening.

The deceased, in the absence of her husband, had been in

the habit of having the prisoner's daughter sleep with her, and on Saturday, prior to the fire, she had sent over to her father-in-law's for the young woman, and, as she was absent from home, the prisoner went in her stead. The prisoner returned home the next morning at the usual hour, and on Sunday evening again went over to the deceased's, but returned in a few minutes, saying that there was no one at home, she had seen no light, and had knocked and received no answer, and found the door fastened. She did not go out again that night, but the next morning early left home and went to the city of New York, where her son was living with a man with whom it was alleged she had been in the habit of having illicit intercourse. She remained in the city until Tuesday morning, the next day after the fire, when a messenger went to inform her of her sister-in-law's death. She returned home that day. The funeral took place on Wednesday, and during the week several examinations into the transaction took place before the coroner and a justice of the peace, during which the prisoner was twice examined as a witness.

During that time suspicion began to attach to the prisoner, but she was not arrested. On Friday evening, while she was sitting with her father's family and her daughter, a man who was married to her sister came in and said that all the neighbors suspected her of having murdered the deceased. She immediately rose and left the room, and after being absent some time the family went in search of her. They found that she was not in the house, and that a cloak and shawl of her daughter's were gone. The weather being very cold and stormy, the search was continued until midnight, and extended throughout the whole neighborhood, but no trace of her was found.

The next morning at daylight she made her appearance at another part of the island, distant some eight miles from her residence, very much worn and haggard in looks, and seeming to have been walking all night. She passed over to New York and wandered about the city all that day, and in the evening went into an eating-house and called for some food.

The woman who kept the house, compassionating her worn and distressed appearance, made up a bed for her, and she went to bed. Before she got to sleep she overheard the people in the house talking of a murder on Staten Island, and that a female was suspected, who had fled, and whom the officers were pursuing. She immediately rose and dressed herself, and began her wanderings again. It would seem that during the night she walked out to Harlem, and on her return fell down in a fit and bruised her face. Daylight on Sunday morning found her in the upper part of the city, near the East river. She continued walking about the city until she passed one of the churches, into which the people were entering. She entered, also, and almost immediately on taking a seat fell asleep. She awoke, when the congregation rose to leave at the end of the services, and began her wanderings again; and after walking about the city for several hours more, she was met by a man who recognized and spoke to her. He told her that the officers were searching for her, and advised her to return to her friends. She replied she "had no friends; they were the first to suspect her." She gave herself up to him, and was surrendered to the authorities of Richmond county, and by them committed to prison, where, in the course of a few days, she gave birth to a still-born child.

When she was thus arrested by the acquaintance who met her in the streets of New York, she was taken by him, in the first place, to the house of one of the aldermen of the city, who directed her to be handed over to the police. In the course of the trial the prosecution offered to prove what the prisoner had said when she had thus been brought before the alderman.

The alderman, being examined as a witness, testified that all the caution he had given the prisoner was that she was not obliged to answer any questions that would criminate herself. He did not tell her that what she said would be used against her, nor did he use any threats, or hold out any inducements to her; and she appeared to be quite broken down, very much depressed and distressed, very much excited, tired and worn out.

The testimony was objected to by prisoner's counsel.

*The Circuit Judge* said, the great object being to get at the truth, and not merely to convict the prisoner, it was most material, first, to inquire whether the prisoner was in such a condition as to be likely to speak the truth. It was not like the trial of a civil suit, where a party might admit away his rights at his own pleasure, and no person but himself be affected by it, or be interested in it. This was a matter in which the whole public were interested, in the administration of justice, and to them it was a matter of more importance that it should be well and truthfully done, than that the prisoner should be convicted. It was, unfortunately, frequently true that confessions of guilt had been made which were untrue, and not to be relied on. He alluded to the case of the death of a female at Athens, on the Hudson river, in respect to whom a man had testified, on an indictment for murder, that he and two others had perpetrated the offense, yet his falsehood was so manifest that he was afterward convicted of the perjury. And, also, to the case in one of the eastern States, where, after conviction, one of the accused confessed his guilt; yet, before the day appointed for his execution, it was ascertained that no murder had, in fact, been committed, but that the supposed victim was still in life. Hence it had become imperative upon courts, in such cases, to be careful to see, first, whether the confession was likely to be true. The state of the prisoner's mind was, therefore, a material inquiry, as was, also, that, whether any inducements had been held out, or threats made, calculated to lead to an untrue statement, and whether the prisoner was made fully aware that what she said might be used as testimony against her. In a recent case in England, Lord DENMAN had refused to receive the declarations of a prisoner in evidence, because he had not been warned by the officer, in whose custody he was, that what he might say would be used in evidence against him. The prisoner must not be entrapped by those in whose custody he may be, to make a confession which may or may not be true. Such a

caution may not always be necessary to warrant evidence of a prisoner's statements, but sometimes that may be a very proper and necessary measure, dependent on the condition of the prisoner's mind, and the circumstances under which the statement may be made.

It must be remembered, in this case, that the prisoner had been driven from her father's house in the night-time, by the suspicions which her own relatives had expressed of her guilt; that for two days and nights, in the dead of winter, she had wandered about the streets of this city; that during her wanderings alone, and in the night-time, she had fallen down in a fit, and had hurt herself; and that when taken before the alderman, she was doubtless in the pains of child-birth; that she was very much depressed and broken down, tired, and very much excited, was among strangers, arrested for a heinous crime, exclaiming, in the extremity of her despair, that "she had no friends; they were the first to suspect her."

This was by no means a favorable state of mind from which to elicit the truth, or one in which the prisoner would be likely to be able to appreciate the force and effect of what, in her mental agony, she might utter, but would seem to be a state of things in which it would be eminently proper to apply Lord DENMAN's rule, and exclude the evidence, because she had not been warned that what she might say would be used in evidence against her.

The question was, therefore, overruled, and the counsel for the prosecution excepted.

The prosecution, having thus, as they claimed, established the *corpus delicti*, proceeded to connect the prisoner with it by various circumstances.

Among other things, it was proved that the bodies were taken to the house where the prisoner lived, and there prepared for burial; and that the funeral took place from that house. One of the neighboring women, who sat up with the corpses during Tuesday night, testified to a conversation of the prisoner, in which she remarked that the one who had stolen the things had committed the murder.

The People v. Mary Bodine.

On Saturday evening, and after the hour at which the prisoner had gone over to the house of the deceased, a female living in a neighboring house heard a cry, as of a female in distress, twice, with an interval of ten or fifteen minutes between them. She opened her window and discovered that the sound proceeded from the house of the deceased.

On her arrival in New York, on Monday, and on her passage from the steamboat to her son's lodgings, the prisoner bought a hood and two green veils. She arrived at his lodgings about ten o'clock, and remained there till about four o'clock the same afternoon, with the exception of some intervals when she went out alone.

It was proved, by several pawnbrokers, that during that day, and at various hours, from twelve to three o'clock, a female, whom they identified as the prisoner, but dressed with a hood and green veil, and not with a hat and black veil, which was her dress when she left home, came to their stores and pawned several articles, a watch, gold chain, silver spoons, a ring, etc., which were all identified as articles belonging to the husband of the deceased, which were left at home by him when he went on the voyage, and some of which had been seen in the house of the deceased on the Saturday before the fire. This female gave her name to the pawnbrokers as Ellen Henderson, of Bergen county, New Jersey.

It was also in evidence that about four o'clock in the afternoon of Monday she left the house where her son staid, on the pretense of visiting a female acquaintance in the vicinity; that she was not seen again by her son until about ten o'clock the next morning, when she again returned to that house; that before her return that morning her son had gone to the place where she had said she was going, and found that she had not been there. The prisoner offered no evidence as to where she had been during that period of time, and during that period it was that the house was discovered to be on fire. But on the part of the prosecution it was proved that there were two lines of boats running between New York and Staten Island, one to Port Richmond, within about two miles of her brother's

9—vol. 1.

house, and the other to the quarantine ground, a distance of eight miles from his house; that the last trip from New York was as late as four o'clock P. M., and the earliest in the morning at eight o'clock, and on the morning next after the fire, at half past six o'clock, the prisoner was seen to go on board the boat at the quarantine ground. She said she had walked a great way, and was tired and cold. She remained in an obscure part of the boat, and returned to the city by the first trip, and must have arrived there about nine or ten o'clock.

On Monday morning, when the prisoner was prepared to go to New York, and while waiting for the stage, she saw a boy go to the house of the deceased and knock loudly for admittance. She remonstrated with him for it, and called him off.

The man with whom the prisoner's son was a clerk, was arrested, and on searching him a letter was found from the prisoner in the following words:

"Mr. Waite you can't imagine my trubles as I slept with Emeline last. I want you to get a soot of close and come to see me with Albert. Close the store — you will be examined concerning my cuming to New York on Monday. You and Albert must say that Albert came to the ferry for me, and I remained with you all day, with the exception of going in Spring street for about ten or fifteen minits to get a basket mended, went out the next mornin about the same lenth of time, was going to stay some days, but her brother-in-law came to let her know about the accident. I and my son returned to the island immegiately. You will be treated well. We are all worn out with examinations. Your store and all is going to be searched, and other places. Hide the things (ritings) I left, and have them put where they cannot be found," etc.

In several different conversations which the prisoner had with various people immediately after the fire, she dwelt on the fact that they who had done the deed had obtained considerable property by it, varying her estimate of the amount from $350 to $1,000; and she gave her advice against offering a reward for the detection of the guilty party, and on one

occasion attempted to direct suspicion toward a colored family on the island.

On Tuesday morning, after she had been informed of the catastrophe, and before she left New York on her return home, she bought her a new pair of shoes, and left her old ones at the shoemaker's shop, saying that they were all worn out.

Some of the witnesses who were present at the fire testified to having found several articles stained with blood, such as the carpet of the kitchen and some pieces of wearing apparel.

It also appeared that a few days before Captain Houseman went to sea, he took over with him from New York about $1,000 in silver coin; that he did this in the day-time, passing over in the steamboat, and carrying the money in such way as to become generally known that he had it. To rebut the inference to be drawn from this fact, viz., that the prisoner might have been led to the perpetration of the murder by the desire to get possession of this money, it was proved that before Captain Houseman went to sea he took this money to his father's and left it there for safe-keeping in his absence; that this was known to the prisoner, and that she had at all times access to that money in her father's house, as well as to about $1,500 of her father's money, which was kept in the same place, and that she had over $1,000 of her own money then out at interest.

In answer to the badges of guilt relied on by the prosecution, the defense proved that the prisoner was in the habit of going over to her son's, in New York, once a fortnight, and that she had, pursuant to this habit, got ready to go over on Friday previous to the fire, but was prevented from going on that day and the following by stormy weather.

The defense also accounted for the prisoner and proved where she was, and what she was doing the whole of the time from Saturday afternoon, when she went over to sleep with the deceased, until the afternoon of Monday, and showed that the only period of time when it was possible for her to have committed the murder, was during the night of Saturday. They then proved by a sister of the prisoner, who lived at her

father's, that on Sunday morning about nine o'clock, while she was sitting by the fire in her father's house, she looked out of the window and saw the deceased sweeping the back piazza of her house, distant three or four rods off from the witness, and by another witness, a niece of the prisoner, that she saw the deceased on Sunday afternoon passing from her house to a wood-house in the yard. This was seen from a house distant some thirty or forty rods, so that it would be difficult to identify a person.

Two other persons testified that they saw a female come out of the house of the deceased on Sunday. One of them was at such a distance that she could not recognize who it was, and the other was a stranger to the deceased, and testified that he saw a man and woman come out of the house and walk across the yard to the road; the man went off down the road and the female returned to the house.

*The Circuit Judge*, in charging the jury, read to them the definition of the crime of murder as laid down in the statute, and said there were three things to be made out — first, the death of Mrs. Houseman; second, that that death was caused by violence; and, third, that the prisoner was guilty of that violence. In respect to the first point there was no doubt, but the other points were left in great uncertainty, and upon them it was the province of the jury to arrive at a conclusion.

Was the death the result of accident, suicide or murder? In respect to this, it was much to be regretted that the post mortem examination left so much in doubt. There was no search for evidences of strangulation or suffocation, none for poison or any narcotic drugs, and as to the marks of violence they were very imperfect. The only point on which the physicians seem to have arrived at any conclusion was that the left arm of Mrs. Houseman had been wounded and broken before death, and that the heat had not been applied to the body until after death. When the bones of the chest were broken, when the ligature had been fastened on the arm, and when the child's skull had been fractured, before or after death,

had been left by that examination still in doubt. They were to look elsewhere for evidence on this point. The screams that were heard proceeding from the house on Saturday night, the appearance of blood on articles found in the room, the position of the bodies under the bed, and the absence of all vestiges of the bed cord; the fact that the outer door was not locked, that the house had been robbed and set on fire, were all circumstances to be considered in determining this question.

In determining the other question, who was the guilty person, it was important, first, to ascertain, if possible, whether the murder was perpetrated in the day-time or at night. If in the day-time, on which day, Sunday or Monday, and if at night, on which night, Saturday, Sunday or Monday. These were important questions in respect to the prisoner, for if the murder had been perpetrated on Saturday night, and the house fired on Monday night to conceal it, the prisoner might have done it, because it was in proof that she had spent Saturday night at the deceased's house, and on Monday night was clandestinely on Staten Island. But if perpetrated at any other time, it could not have been the prisoner, because her "whereabouts" at all other times, from Saturday till Tuesday, had been satisfactorily explained. In determining this question on the outset the jury must not overlook the fact that the remnants of clothing found on the body of the deceased were those of her day, and not of her night clothes.

There were two rules that were to govern the jury throughout; one was that it would not be safe to convict upon one circumstance, alone, but only upon a connected chain; the other was, that such chain should be consistent in the hypothesis of guilt, alone; for, if the circumstances might all be true, and it were possible for her still to be innocent, it would not do to convict. In regard to this, the jury must recollect and consider her condition of concealed pregnancy, the disclosure of which might involve her in great disgrace, and might produce in her a desire to get rid of the evidence of her shame which she carried in her bosom, and corresponding conduct

which might account for her on that all important Monday night, as to which no evidence had been given on her part. Her counsel had, it was true, attempted to account for her that evening, by alleging that such was her employment then, and that the persons among whom she had been for that purpose, were too low and infamous in character to be relied on as witnesses, or too fearful of the consequences to come forward as such. This explanation clearly implies that she must have been engaged in the unlawful task of attempting to destroy her child, for if she had been giving birth to it, in the fullness of time, no such considerations could have stood in the way of her proving it, especially when that proof was so vastly important in screening her from a conviction for such heinous crimes as murder, arson and robbery. But, unfortunately for such explanations, she had not on that night given birth to a child, either lawfully or abortively, and she was seen on Staten Island at so early an hour the next morning, as clearly to have implied that she must have gone there the day before, and must have been on that island during the very night on which, according to this explanation, she would have been in the city, attempting to get rid of her child.

Upon this point, also, the jury were charged to remember the open manner in which her brother, Captain Houseman, had carried home his money a short time before, so much so as almost to hold it out as a bribe to the thieves and rogues who infest our city, to rob him, and, in robbing him, to forge such evidences of guilt against others as to divert suspicion from themselves. Captain Houseman seemed to be unconscious of any such danger, because, as he said, he had carried the money over to his father's, and had not left it at his own house during his voyage to sea. But he overlooked a fact, which the jury must not overlook, that while his carrying the money home was publicly known, his taking it to his father's was known to the family, only, and it might therefore be that thieves, watching to rob his house, may have discovered that the prisoner slept with the deceased, and so been tempted to direct suspicion toward her. It would, therefore, be impor-

tant for the jury to inquire whether there was evidence in the case to direct suspicion toward any one else than the prisoner, and, in this connection, they would remember the strange man who was seen passing the house in the highway, with a bundle, in the course of Sunday, and the young man who was seen, on Sunday, at the house, in the company of a female; and the jury would bear in mind that where the concurring circumstances clearly point out the offender, the proof is strengthened by the total absence of any trace or vestige leading to another agent.

Having premised this, the judge proceeded to enumerate and comment on the badges of the prisoner's guilt.

The first was the prisoner's letter to her daughter, who, when at home, slept with the deceased, urging the daughter to prolong her absence; but, in respect to this, it must be remembered that the weather was stormy, and the roads bad; that the letter was written on the Wednesday previous, when Captain Houseman was expected home every moment, and was sent to the daughter unsealed.

The next was the hearing of screams on the Saturday night, implying the acting of some deed of violence at the deceased's home at that time. But, in respect to that, it must be remembered that they were heard by one person, alone, and she not particularly intelligent; were not heard by other members of her family, and that they might have proceeded from an insane man who was passing at the time, and who had since died in a lunatic asylum.

The next was the prisoner's having slept with the deceased on Saturday night, and having been the last person who had been in her company while alive, thus implying that the prisoner had the opportunity of perpetrating the murder, but in respect to this it must be remembered that she had had the same opportunity for several nights prior to that, that the time for her brother's return home had arrived, that on Saturday morning she had prepared as usual to go to New York, and had been prevented by the storm, that she asked her sister to take her place with the deceased that night, that her going

there and returning home next morning were very public and notorious, and that some witnesses had testified to having seen the deceased alive during the day of Sunday.

In the next place, the pawning of the stolen property in New York on Monday. The pawnbrokers all identified her. Her son testified that in the course of the day, at twelve and at two o'clock, the prisoner went out and was gone each time an hour and a half. At those periods of time the pawnbrokers had said she came there, giving them the name of Mrs. Henderson, of New Jersey, and clothed, not with the hat she wore on leaving home, but with a hood and veil like those she had bought that morning.

In the next place the fact that about four o'clock in the afternoon of Monday she left her son, saying that she was going to spend the night with an acquaintance, Mrs. Strang, and was not seen in New York again until ten o'clock the next morning. The last steamboat left the city for Staten Island that day at half past four, and the first boat that returned was at eight o'clock the next morning. She did not go to Mrs. Strang's, but she had thus the opportunity of going over to Staten Island, firing the house to conceal the murder, and returning to town the next morning. She was seen on Staten Island early the next morning, going on board the steamboat, more than an hour before its time for starting, worn and tired, as if with a long walk, and this boat, not that which was nearest to her father's house, which she usually took and where she would be likely to meet with acquaintances, but a boat at a ferry some eight miles distant, where she was not known, and where by remaining within the obscurity of the cabin she might hope to escape observation.

Under these circumstances, as it had thus been proved that she could have fired the house on Monday night, that some of her conduct, as proved in respect to that night, was clandestine, and as she best knew where she was during the night, it would be just that she should be called on to account for herself, and as she did not, by any evidence in the case, the jury would be warranted in drawing strong inferences against her.

The attention of the jury was next directed to her behavior on Tuesday, when her brother-in-law went over to the city to inform her of the catastrophe. Her delay in returning home, her declaration on board the boat, that the person who had done it must have got, at least, $1,000 by the robbery, when she knew that her brother's money was not there, and her total omission to make inquiries into the circumstances, were all proper subjects of consideration.

She knew, as early as Wednesday, that suspicion had attached to her, yet she advised against offering a reward for the detection of the perpetrators. While, on the one hand, it is urged that if she was innocent she was strongly interested in having the real offender brought to light, but if she was guilty she might fear that a reward might disclose her dealings with the pawnbrokers, on the other hand it is insisted that, being already suspected, she might well fear the effect of a large reward, in fabricating other badges of suspicion against her.

The next circumstance dwelt upon was her letter to her paramour, Waite, and which was found on him when he was arrested. This had been sent to him after she had been examined before the coroner, after she had been suspected, and after a reward was offered, and it asked him to bear false witness as to her conduct on Monday and Tuesday, and to conceal the things (or "ritings") which she had left. Was this for the purpose of concealing her guilt of this crime, or to hide her shame in reference to her pregnancy?

Her flight and concealment, from Friday night till Sunday afternoon, had also been alluded to as evidence of her guilt. It was true that flight from justice might be relied upon as evidence of guilt, but it must ever be borne in mind that the over sensitive will just as readily fly from unjust suspicion, and the timid from fear of a conviction, whether guilty or not; and it was for the jury to say whether, laboring under the primeval curse, she was wandering a fugitive and vagabond on the face of the earth, or whether, weighed down by the sense of impending shame, and depressed with the idea that she had no friends, and that amid so terrible a calamity all had aban-

doned and suspected her, she was not seeking relief from her overwrought feelings in violent physical exertion? But it must be borne in mind, that mid her wanderings she knew that the officers of justice were in pursuit of her; she had the means of fleeing to a far distance, yet wandered merely about the streets of New York, taking no pains to go beyond its bounds.

The jury, in inquiring into the prisoner's guilt, would naturally look for a motive. This was proper for them to do, for in law, as in morals, an evil motive constitutes the essence of guilt, and the existence of an inducing motive for the voluntary acts of a rational agent is assumed as naturally as secondary causes are concluded to exist for material phenomena. The usual inducements to crime are the desire of revenging wrongs, of obtaining some object of desire which belongs to another, or of preserving reputation, either that of general character, or that peculiar to sex or profession.

There is no evidence in this case of any ill-will of the prisoner toward the deceased. On the other hand the evidence all went to show that she was kindly in her disposition, and was attached to Mrs. Houseman and her child.

She could have had no pecuniary object in view, for, if the evidence is to be believed, she always had money enough for her own purposes; she knew that her brother's money was in the house where she herself lived, and she always had access to that, and to much more, the key of the chest in which it was kept being always within her reach.

And whether a motive might be found in the fact that her sister-in-law had discovered the pregnancy which had thus far been successfully concealed from her mother, her sister and her daughter, and might disclose her shame unless put out of the way, with her child, who was old enough to say "Aunt Polly did it," is a question which must be left for the jury. But, in searching for a motive, it must not be expected that such will be discovered, as, tried by the strict rules of morality, or by the standard of the juror's own mind, will be regarded as adequate to such heinous crimes. It is the essence of moral

weakness that it forms a mistaken estimate of present advantages, and a want of proportion will therefore of necessity be found between the objects of desire and the means employed to obtain them.

The jury must also bear in mind that the prisoner had proved her character to be that of a lively, cheerful, kind and affectionate woman. Character is of great weight in every case, and requires particular attention where the accusation is grounded on circumstantial evidence. It creates a greater degree of doubt than when the prosecution is supported by direct evidence. In the former case character ought to be particularly attended to, because the jury is more or less embarrassed and called upon to weigh the case with more scruple and doubt, from the very nature of the evidence. The perpetration being established, the atrocity of the crime renders fair character and correct general deportment of value, because in such a case the probability of great moral depravity is more slight. The prosecution had no right to go into evidence as to general character, unless that subject was first opened by evidence in that regard on the part of the accused.

The law leaves that entirely in the hands of the accused. If the accused go into evidence of general character, the prosecution may rebut it; but, until the defense do so, the prosecution has no right to touch it; and it becomes, therefore, material for the jury to inquire why it is, that in so particular a case as this is — where there are so many allegations of atrocious conduct — a case supported as this is, by circumstantial evidence, that there has been no inquiry on the part of the prisoner as to general character? She is proved to have been kind and affectionate to the deceased, loving, kind and affectionate at home. So far as that goes as evidence of character, it is entitled to weight; but whether it acquires an unfavorable tendency from the absence of further evidence on that subject, the jury were to judge. I leave it in your hands, with the single remark, that "character may be of great value to the prisoner."

And the counsel for the prisoner did thereupon except to all that part of the judge's charge which related to general character.

The jury thereupon retired to deliberate upon their verdict, and returned into court, stating that they had not agreed upon a verdict, and that they desired further instructions from the court. One of the jurors thereupon inquired of the court: "Must not the prosecution prove Mrs. Bodine to have been in the immediate neighborhood of George Houseman's on the night of the fire, or must the prisoner prove her whereabouts on that night?"

*The Court*, in answer to the question of the juror, charged, that if the testimony on the part of the prosecution had shown that the prisoner might have been at the scene of the fire on Monday night, the *onus* was cast upon her to get rid of the suspicion which thus attached to her, or show where she was on Monday night; that in this respect the burden did not rest upon the prosecution; but that there was evidence enough to throw a suspicion upon the prisoner, and entitle them to call upon the prisoner to show her whereabouts on that night.

*The Counsel for the Prisoner* then asked the court to charge the affirmative of the first proposition of the question of the juror, as the law.

*The Court* refused so to charge, and the counsel for the prisoner then and there excepted to such refusal, and also to the charge of the court in that behalf, as above set forth.

The jury again retired, and after being out for fifty-six hours (during which time they were furnished with refreshments under the order of the court), they brought in a verdict of guilty.

A bill of exceptions having been sealed in the case, was argued at the May Term of the Supreme Court, 1845.

At the July Term the Supreme Court granted a new trial,

Mr. Justice BEARDSLEY delivering the opinion, of which the following are extracts:

The circuit judge, in this case, seems to have held that nothing short of a fixed and decided opinion as to the guilt or innocence of the prisoner, furnished ground on which the triers could set aside a juror. Evidence of the formation of hypothetical opinions were objected to by the public prosecutor, and excluded by the judge. One of the jurors was asked, if he had "ever *thought* Mrs. Bodine was guilty of the crime for which she was then to be tried." This was objected to on behalf of the people, and "the objection was allowed and sustained by the court, on the ground that the question should be, 'had you an *opinion*,' instead of 'have you ever thought.'" Following out this view of the law, the judge refused to allow an inquiry of a juror whether what he had read or heard made any impression on his mind as to the guilt or innocence of the prisoner. Upon these, as well as other points on the same subject, formal exceptions were taken by the counsel for the prisoner. Some of the jurors, in regard to whom questions were made, were found to be indifferent by the triers, and were allowed to serve on the jury. Others were excluded by the peremptory challenge of the prisoner. I think the learned circuit judge erred in his view of the law applicable to challenges for favor. A fixed and absolute opinion may be necessary to sustain a challenge for *principal* cause, but not so where the challenge is for *favor*. In the first species of challenge, the result is a conclusion of *law* upon ascertained facts; but, in the latter, the conclusion is a matter of *fact*, to be found by the triers. No certain rule can be laid down for their guidance. They are sworn to try whether the juror challenged *stands indifferent*. (Gra. Pr. 307; 1 Trials per pais, 205; 1 Salk. 152, p. 1; Bac. Ab., [James' ed.] 12, note.) And this must be determined upon their conscience and discretion, in view of the facts and circumstances in evidence before them. It is competent to prove that the juror challenged, and the opposite party, are in habits of great intimacy; that they are members of the same society, partners in busi-

ness, or the like. The feelings of the juror may also be shown, and that whether they amount to positive partiality, or ill-will, or not, as his views and opinions, also, may be, whether mature, absolute or hypothetical. Indeed, any and every fact or circumstance, from which bias, partiality or prejudice may justly be inferred (although very weak in degree), is admissible on this issue; and the inquiry should by no means be restricted to the isolated question of a fixed and absolute opinion as to the guilt or innocence of the prisoner. Upon this ground, it seems to me the judge erred, and a new trial should be granted, unless the prisoner is precluded from taking this objection on a bill of exceptions, or by some fact therein contained, which must be deemed a bar or waiver to the objection.

The prisoner challenged but thirteen jurors *peremptorily*, although she might have challenged twenty. (2 R. S. 734 I. 9.) As she might thus have excluded all who were challenged for favor, and not set aside by the triers, it is argued that the omission to do so precludes all exception on the part of the prisoner to what was done by the judge, however erroneous it may have been. The law, it is said, gives the right to make peremptory challenges, in order to correct errors of this description, and the prisoner, having refused or neglected to avail herself of this remedy, is thereby estopped from resorting to any other mode of redress.

This argument is specious, but, I think, not sound. Every person on trial is entitled to a fair and impartial jury; and to secure this, challenges for *cause* are allowed and are unlimited. If adequate cause is shown, the juror, in every instance, should be set aside. This is the right of the party challenging, and is in no case to be granted as a favor. Such is plainly the law where peremptory challenges do not exist, and where they do the rule is the same. The statute provides that every person who has a right to challenge peremptorily is also " *entitled to the same* challenge as one allowed in civil cases, either to the array as jurors, or to individual jurors." (2 R. S. 734, I. 10.) Those who may challenge peremptorily, may, therefore, also challenge for cause. Nor is this an idle ceremony, which

the judge may in any case overlook or disregard. He is bound, *ex debito justitia*, to receive the challenge, and dispose of it as the law requires. He certainly would not be allowed to disregard a challenge for cause, and turn the party making it over to his peremptory challenges. Nor, in my opinion, can the fact that the party still has peremptory challenges at his command, deprive him of any redress which the law would otherwise give for a violation of his rights.

Peremptory challenges are allowed to a prisoner on trial, to be made or omitted, according to his judgment or his pleasure, will or caprice. No reason is ever given or required for the manner in which the right is exercised by the party. Blackstone says they are allowed "on two reasons. First, as every one must be sensible what sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another, and how necessary it is that a prisoner — when put to defend his life — should have a good opinion of his jury, the want of which might totally disconcert him, the law will not that he should be tried by any one man against whom he has conceived a prejudice, even without being able to assign a reason for such, his dislike. Second, because upon challenge for causes shown, if the reasons assigned prove insufficient to set aside the juror, perhaps the bare questioning his indifference may sometimes provoke his resentment — to prevent all ill consequences of which, the prisoner is still at liberty, if he pleases, peremptorily to set him aside." (4 Bl. Com. 353; *see*, also, 1 Ch. Cr. Law, 534; 1 Inst. 156 *b*.)

In no case is the prisoner bound to resort to his right to make peremptory challenges. It is armor which he may wear or decline at his pleasure. It is for his own exclusive consideration and decision, and with which the court has no right to interfere. Nor should the prisoner's refusal to make use of her peremptory challenges, as she might have done, preclude her from raising objections to what was done by the judge; and if, in truth, errors were committed, I do not see that it is less our duty to correct them than it would have been if the prisoner had fully exhausted her peremptory challenges. The

use or disuse of that right, I regard as a fact wholly immaterial to the question now before the court, and which cannot rightfully exert the slightest influence upon the decision to be made.

The remarks of the judge upon the subject of general character were, in the main, correct, although I think he erred in the stress laid on the absence of evidence of good character. He seems, in effect, to have advised the jury that as the prisoner, who alone could make the question, gave no evidence that her general character was good, this authorized an inference that it was positively bad.

This presented a question for the jury which I think was not properly before them. Where no proof of general character is given, the law assumes that it is of ordinary fairness and respectability. A prisoner on trial may show what his reputation is, and then the question is open to the prosecution and for the jury to determine, like other controverted facts. But if the prisoner chooses to give no evidence on the subject, the jury are not at liberty to indulge in conjecture that his character is bad in order to infer that he is guilty of the particular crime charged. Good character is a shield which the prisoner may use *if he has it; but if he is content to leave his* character entirely out of the case, the jury are not thence to infer that it is bad. Under such circumstances the general character of the accused is hardly a subject to be considered by the jury, and they should determine the guilt or innocence of the accused upon the evidence before them, and wholly irrespective of the question of general character.

The jury not having agreed upon a verdict, came into court, and one of them made this inquiry of the judge: "Must not the prosecution prove Mrs. Bodine to have been in the immediate neighborhood of George Houseman's on the night of the fire, or must the prisoner prove her whereabouts on that night?" In answer to this question the learned judge "charged that if the testimony on the part of the prosecution had shown that the prisoner might have been at the scene of the fire on Monday night, the *onus* was cast upon her to get

rid of the suspicion which thus attached to her, or show where she was on 'that night'; that in this respect the burden did not rest upon the prosecution, but there was evidence enough to throw a suspicion upon the prisoner and entitle them to call upon the prisoner to show her whereabouts on that night." As the murder was supposed to have been perpetrated a day or two before the fire of Monday evening, it could hardly have been made a turning point in the case that the prisoner was or was not at the place of the fire when it occurred, although the fact of her presence might have been a very decided piece of evidence against her. Had the prisoner, however, proved past all contradiction that she was not in the neighborhood of the fire when it occurred, that might have fallen far short of establishing her innocence. She might have perpetrated the murder and still been guiltless of the arson. It was only material to prove the latter crime upon her, as it would authorize the inference that it had been committed to conceal the previous murder. But it certainly was not indispensable that the prosecution should prove by *direct* evidence that the prisoner was in the neighborhood of the fire when it took place. Her presence and her guilt could be established by circumstantial as well as by direct testimony. The judge was therefore correct in saying that if the testimony showed that the prisoner *might* have been at the scene of the fire when it occurred, it was not indispensable for the prosecution to prove her actual presence on that occasion. But the judge goes further and instructs the jury that if the prisoner *might* have been so present—not if she in fact *was* so present—"the *onus* was cast upon her to get rid of the suspicion which thus attached to her." To this I cannot accede. The mere fact that the prisoner *might* have been at the scene of the fire was not of itself a cause for any suspicion. It is not improbable that hundreds of persons on the island were in the region of the fire, and *might* have been at the place where and when it occurred, but so slight a circumstance could not justly cast suspicion upon any one. It may well have been that other evidence given on the trial, and which does not appear in the bill of exceptions, connected with

11—vol. 1.

the fact that the prisoner was in such a situation at the time of the fire that she *might* have been actually present, furnished very cogent grounds for suspicion against her. But the charge puts it in a more restricted form, and instructs the jury that if the prisoner *might* have been at the scene of the fire when it occurred "the *onus* was cast upon her to get rid of the suspicion which thus attached to her." This position was too narrow.

For the reasons stated I think there should be a new trial.

In consequence of this decision, a new trial was attempted to be had at the November Circuit, 1845, at which time about three weeks were spent in the effort to obtain a jury, and over six thousand jurors were summoned; about four thousand were tried on challenges, and all set aside except ten.

The challenges now interposed for the prisoner were, in the first instance, for principal cause, on account of a bias.

Nielly Lockwood, called as a juror, was challenged for principal cause, and was sworn, and asked whether he had formed any opinion as to the guilt or innocence of the prisoner.

*The Circuit Judge:* That is a question which you have no right to put to the juror, and which he is not compelled to answer; because it tends to his disgrace, for him, liable to serve as a juror, to say that he had formed an opinion in a matter involving the life of a fellow creature, and her guilt of the crime of murder, and he would not allow the question to be put, unless consented to.

*Whiting,* for the prosecution, said they were determined to have no exceptions taken, if they could avoid it, and they therefore agreed that any question might be asked.

The juror answered that he had not, whereupon the challenge was overruled by the court.

The People v. Mary Bodine.

*The Prisoner's Counsel* then challenged the juror to the favor, on account of bias.

*Circuit Judge:* That you cannot do. You must make all your challenges at once. To allow you, now, to make this challenge, would be virtually permitting the prisoner to appeal from the decision of the court to the judgment of the triers, and that was an irregularity which ought not to be tolerated.

*Whiting* said, that, for the same reasons, the prosecution would not object.

*The Circuit Judge* said it was very irregular, but if both parties agreed to it, he did not perceive that he had the right to interpose an objection.

The challenge was found true by the triers.

James Steward, called as a juror, was challenged for principal cause, and testified that he had not expressed an opinion, nor formed one, altogether; had an impression that the prisoner was guilty. He was asked this question: "Is that an opinion formed, or a vague and indefinite impression?" and answered that "it was either one or the other." This challenge was overruled, and he was then challenged to the favor, and, being again sworn and examined, testified that he was strongly impressed on the question of the prisoner's guilt, but the impression was not such as to bias his mind, nor to disable him from weighing and deciding according to the evidence. He had no personal knowledge of the facts, nor did he know any thing of it, except what he had read and heard.

*Graham*, for the prisoner, insisted that if the juror entertains an impression unfavorable to the prisoner, he was disqualified.

The triers found the challenge true.

Robert C. Skidmore, called as a juror and challenged to the favor, testified that he had formed an opinion from what he had read of the former trial, but that if he was sworn as a juror he should not allow what he had read to influence his mind.

The triers found the challenge true.

Thomas S. Miller, challenged for principal cause, testified that he had formed no opinion; that he had read some of the former trial, and it made an impression on his mind. The challenge was overruled and the prisoner's counsel then challenged the juror for favor. He was sworn, and testified that he had read the judge's charge on the former trial, and the impressions on his mind arose from that. It gave him cause of suspicion against the prisoner. He was asked: "Has that left an impression on your mind or only on your memory?" This question was objected to by the district attorney.

*Circuit Judge:* The Supreme Court say that any question is proper that tends to show the state of the juror's mind, and I must therefore allow this.

The juror answered, it had left an impression on his mind, but he had no prejudice against the prisoner. He was then asked: "Are we to understand that you have a prejudice against her as to her guilt or innocence in this case?"

*Whiting* objected to the question. It had already been virtually answered.

*Circuit Judge:* How can you discriminate between this question and a similar one asked on the former trial? There, after a juror had said that he had no opinion formed, he was asked what he thought on the subject. I excluded the question on the grounds now taken, but the Supreme Court held that I erred. I must therefore allow this question, and particularly because it may tend to show the state of the juror's mind.

The People v. Mary Bodine.

The juror answered that he had no ill-will toward the prisoner, but from his suspicions of her guilt he had an unfavorable impression of her.

*The Counsel for the Prisoner* requested the court to charge the triers that, as matter of law, the juror was not indifferent if he has the least bias on his mind. The court refused so to charge, saying it was for the triers to say as matter of fact whether the bias was such as to disqualify him.

They also requested the court to charge that if the juror would be influenced by some bias on his mind not derived from the evidence, but existing at the time he enters the jury box, he is not indifferent.

*Circuit Judge:* I so understand the Supreme Court's decision, and so charge.

*The Counsel* also requested the court to charge that it was not necessary, to disqualify a juror, that he should have a fixed and decided opinion.

*The Circuit Judge*, for the same reason, so charged.

They also requested the court to charge that if the juror entertained an unfavorable opinion as to the prisoner's guilt, he was not, in legal judgment, indifferent.

*The Circuit Judge* said he had always entertained the opinion that nothing short of a fixed and definite opinion in the mind of a juror ought to disqualify him; and that it was not proper to exclude one because of certain vague impressions founded on rumors or newspaper reports which he could not know to be true, and he had, therefore, on the former trial, advised the triers not to exclude a juror unless he had a belief in the truth of the facts he had heard or read, and a fixed and settled opinion founded thereon. But in this the Supreme Court had held that he was wrong, and they had also held

that any questions might be asked which tended to show the state of the juror's mind. He could therefore find no limit to the inquiry, nor any basis on which to limit the discretion which the triers might exercise in setting aside any one. This might, to be sure, set aside every reading or thinking man, and drive the courts, for their aid in the administration of justice, to the ignorant and the unlettered ; but that he could not help, and while he could not charge the triers that an unfavorable impression on the juror's mind, in legal judgment disqualified him, he would not say to the triers that they ought not for that reason to set him aside. Under the decision of the court they could do so if they pleased, though it was most manifest that this juror was a candid and intelligent man, and had himself declared that he could decide the case according to the evidence, notwithstanding the impressions on his mind, and though the court had already, on the principal challenge, held him to be indifferent.

*The Counsel for the Prisoner* excepted to the judge's refusal to charge as requested, and the triers found the challenge true.

John Murray, called as a juror, was challenged by the prosecution for principal cause, and testified that he would not convict on circumstantial evidence.

*The Court* allowed the challenge, because the juror had sworn he would not believe legal evidence. Perhaps the juror honestly thought so, but the judge said he attached very little consequence to such a declaration, after the experience of the last trial, for there several of the jurors who were impaneled said the same thing, yet when they came to understand what circumstantial evidence was, they found no difficulty in arriving at a conclusion upon it.

William Bennett, called as a juror and challenged for principal cause, testified that he had formed no opinion as to the

guilt or innocence of the prisoner, but he had formed a decided opinion as to the fact of a murder. He believed that Mrs. Houseman and her child were murdered and the house set on fire by design. '

*A. L. Jordan*, for the prisoner, contended that this being a point material to the issue, and one on which there would be a contest, and which the jury were to find, the opinion disqualified.

*Whiting*, *contra*, insisted that the opinion, to disqualify, must be as to the guilt or innocence of the prisoner, and not as to any of the facts which went to establish guilt.

*The Circuit Judge:* I have recently held otherwise. In the trial of Smith Boughton, at Hudson, in September last, for highway robbery upon the sheriff of the county, where one material question was whether the sheriff's papers had been voluntarily surrendered, or were forcibly taken from him, I ruled that a decided opinion on that point disqualified, and I was induced so to rule in imitation of a ruling of Chief Justice MARSHALL, on Burr's trial.

To save the necessity of having these various questions raised so repeatedly, I will take this occasion, once for all, to express the views which I take of the decision of the Supreme Court, and to lay down the rules which will govern me, under that decision, in our attempt to get a jury in this case.

The rule, as it long prevailed in the English courts — as it existed at the adoption of our Constitution, when the English common law was made the law of our State — and as it has been explained since the revolution, was clearly laid down.

It was not ground of challenge, that the persons had already given a verdict, and found others guilty, who were indicted in the same indictment. (Kel. 9.)

In *John Dunn's case,* Trials *Per Pais*, 157, two were indicted, capitally, and they refused to join in their challenges. The prisoner challenged one of the jurors, because he had been a

juror on the previous conviction. The attorney-general demurred.

The demurrer was allowed, the court observing that the juror had pronounced no opinion on the prisoner's case, and a verdict given, on a belief of the testimony of one witness, could not affect a case which might be supported by the testimony of another witness. (1 C. & D. C. C. 190.)

If it shall appear that the juror made such declaration from his knowledge of the cause, and not out of ill-will, it is no cause of challenge. (Joy on Con. 184; 2 Hawkins Cr. 43 s, 28; 2 R. Ab. 657.)

The law was held to be so as long since as Henry VI., as stated in the Year Books; that if a juror is challenged for favor, though he has twenty times declared that he will find for the one party or other, on account of the knowledge he has of the truth of the matter, he is to be deemed indifferent; but it is otherwise if he has said so on account of affection for one party more than the other. (Bac. Ab. Chall. 55, 7 Hen. VI. A. D. 1426.)

A juror stated that he had expressed an opinion on reading the report of the prisoner's former trial in the newspapers. This was held not to be a good cause of challenge. (Joy on Con. 191.)

In the *case of Cooke* (13 How. St. Tr. 339), the court charged: If the question put to the juror is merely as to having formed an opinion, and if it is not intended thereby to insinuate any thing to his discredit, such question is immaterial, because the formation or expression of an opinion may have arisen solely from a knowledge of the case, or from having read the evidence given on a former trial, and upon the supposition that such evidence was true; and the formation, or expression of an opinion, under such circumstances, is no ground for setting the juror aside, but is quite compatible with his being indifferent, in the legal sense of that term.

The very terms of the challenge, *propter affectum*, for affection, imply a moral bias, partiality or passion. (Joy on Con. 201.)

If he will pass for one party, whether the matter be true or false, he is favorable. So, if he has said that he will pass for one party, if it be for affection that he has to the person, and not the truth of the matter that he has a knowledge of, he is not favorable. (Fitzherbert Chal. 22.)

In the Year Book 7, Hen. VI., A. D. 1429, the charge is: You will inquire, on your oaths, whether the cause be for partiality or affection that he has to the party, or for the knowledge he has of the matter in issue. If the cause is partiality for the party, then he is favorable; otherwise not.

In *O'Conner's case* (24 How. St. Tr.), BULLER, J., charges: You will say, upon the evidence, whether you are of opinion that the juror is a person who will try the prisoner upon the evidence that may be given.

In *Edmonds' case* (4 B. & Ald. 492), ABBOTT, Ch. J., says: Expressions used by jurors are not a cause of challenge, unless they are to be referred to some thing of personal ill-will toward the party challenged.

The mere expression of an opinion as to the prisoner's guilt or innocence, from any cause but that of malice or ill-will, does not disqualify. If you come to the conclusion, that by the notoriety of the facts stated publicly, and spoken of through the country at large, an opinion has been formed by him without partiality, or a particle of ill-will against the prisoner, then he is not favorable. (CRAMPTON, J., in *Hughes' case*.)

Upon an objection by counsel to this way of putting it, CRAMPTON, J., said: The result of your argument would be that a second or a third trial could never be had in any country. He also says: Persons may declare their opinions, not wishing to act as jurors. They may make slight remarks upon their views of the case, in order to avoid the responsibility, etc.

It seems obvious that the court might embarrass itself inextricably in every case which excites public or party interest, and acquire general notoriety, if this distinction were not strictly and uniformly observed. In the case of a second trial,

for instance, for the same offense, every man who has read a newspaper, or statement of the circumstances, and of the part alleged to have been taken by the prisoner, every one who was present in court, being on the panel of the county, and obliged to attend from day to day, and who heard the evidence given on the former trial; every one who has read the report of the coroner's inquest, or the evidence of the former trial, as given in the prints, and whose mind, supposing the report of the evidence to be true, had formed or expressed an opinion of the guilt or innocence of the prisoner, might be challenged, and the panel be altogether exhausted. On the ground of expediency, therefore, as well as that of legal principle and high authorities, both ancient and modern, it seems reasonable that the law on this point should be considered settled, and should not be made the subject of discussion on criminal trials, it being of the utmost importance to securing public confidence in the administration of criminal justice, that its rules should be fixed and certain, the same by whomsoever and wheresoever administered, and applicable, as far as possible, to all cases. (Joy on Con. 207.)

The same rule has been recognized in our own courts.

In the *case of Van Alstyne* (referred to in 6 Cow. 565), Chief Justice SPENCER laid down the rule, that if a person had formed or expressed an opinion for or against the prisoner, on a knowledge of any of the facts, or from information of those acquainted with the facts, it was good cause of challenge; but if the opinion was formed on mere rumors and reports, such opinions did not disqualify.

In the *case of Vermilyea* (6 Cow. 555), the juror had heard all the evidence, having been present at the trial, and said he had made up his mind perfectly on the evidence and had frequently expressed his opinion. He said also that he had no bias or partiality—that if the evidence was the same as on the former trial, he should find the defendant guilty; but he added he felt competent to give a verdict according to his oath, and the evidence as it should appear. He was challenged for principal cause and found indifferent.

The judge, in delivering the opinion, seems to admit the law as laid down in 4 B. and Ald., but he adds his apprehension, that after the lapse of centuries it would not be presumption to inquire whether the rule has not been misapplied. He says that the formation and expression of an opinion, constituting a good cause of challenge, is founded on the supposition that it creates a bias, and the question is not how great is the bias, but does any exist. The least is sufficient to exclude, and it is the same thing whether the bias proceeds from a preconceived opinion, or malice, or ill-will, and he sums the matter up by laying down the rule thus: The true ground is, not whether the juror feels resentment, or ill-will, but whether for any cause he has a bias on his mind that may disqualify him for deciding with strict impartiality.

Although the expressions of the judge are very general, yet the point ruled was in conformity with preceding decisions, viz.: that the opinion, to disqualify, must be founded on a knowledge of the facts, or on information derived from those who know the facts.

Thus, then, the law had continued from the Year Book 7, Henry VI. (1429) down to 1826, a period of nearly 400 years.

In *Mather's case*, in 1830 (4 Wend. 229), the question again came up, and was elaborately discussed by the court, and there, for the first time, as I read the reports, the rule is established that an opinion will disqualify which is founded on rumors, reports, and newspaper publications.

In that case the juror testified that he had no fixed opinion upon the subject of the defendant's guilt, other than such impressions as are formed on history and common reports; that is, printed statements in papers, and reports in conversation, and not derived from any witnesses to the transaction.

This was held by the court to be good ground of principal challenge, and, I repeat, was the first case I can find in our reports where it was held that opinions founded on mere rumor and newspaper reports would disqualify.

This case was much relied upon on the former trial of this cause, and it seemed to me that if its principles should be car-

ried out, as understood and contended for on the part of the defense, it would create a very serious impediment to the administration of criminal justice, as it served not only to enable those jurors who were disinclined to perform their duties as such, to exempt themselves from the irksome task of serving on a protracted case, but would also afford to prisoners whose imputed crimes had been attended with such circumstances of atrocity as to give general notoriety to the transaction, an additional chance of escaping conviction.

I therefore felt it to be my bounden duty to restrict this rule, as far as was in my power, so as to guard, as far as practicable, against consequences so disastrous. I was not unmindful of the obligation to have an impartial jury, and while I was aware that it might very well be that a juror might imbibe from rumor, or newspaper reports, so strong an impression as justly to cause his impartiality to be doubted, I was also aware that in a community where there are so many who can read, and where there are so many and so great facilities for diffusing information, very many would imbibe loose and floating impressions. And it seemed to me that if the rule was carried out, to the extent contended for, courts would be compelled, in cases of notoriety, to seek for their aid, in executing the law, only among the ignorant and uninformed, and, of necessity, be denied the assistance of all well informed and intelligent jurors.

In looking for the means of guarding against these consequences, I naturally recurred to the reasons on which the rule was originally based, and had been for so many years administered. As the rule had been founded on personal knowledge of the facts, or information derived from those who had that knowledge, it seemed to me necessary to imply that there should be in the mind of the juror a belief of the facts out of which his opinion grew.

I therefore felt myself at liberty, nay, I felt bound, in order to guard against the consequences which I apprehended, to adopt the restrictions which have been condemned by the Supreme Court; and I accordingly instructed the triers that

it would not be discreet for them to reject a juror on account of opinions which were founded on rumor, or newspaper reports, unless they were fixed and decided opinions, as contradistinguished from mere casual impressions, and were founded on a belief of the facts, as contradistinguished from a hypothetical opinion, resting on the supposition that the facts might be true; and, if I recollect aright, carrying out these views, in one instance, where a juror said he had no *opinion*, I excluded a question — "what he thought of the case."

In all these regards the Supreme Court have decided that I was in the wrong; and after an anxious and careful examination of the various decisions since *Vermilyea's case*, and after having been called upon in a recent case, in the country, to act upon this decision, where I was assisted by the law officer of the State, and able and experienced counsel for the prisoner, I am compelled to deduce this, as now the established rule, viz.: That an opinion, formed or expressed, will disqualify, whether founded on a knowledge of the facts, or on information derived from those who had such knowledge, or on mere rumors, or newspaper reports, and whether a fixed and decided opinion, or not, and whether founded on belief or not.

And I cannot conceive that it makes any difference whether the challenge is for principal cause, or to the favor. In both instances the challenge is for bias, and, in both, the formation or expression of an opinion is received only as evidence of bias; and in both cases the decision must be governed by the rule thus laid down by the Supreme Court for our government.

The only difference is, that the court, in deciding upon a principal challenge, is bound, peremptorily, to obey the rule as laid down by the superior tribunal; while, upon a challenge to the favor, if the triers see fit to disregard the rule, there is no revising their decision. Hence, the control in the matter is taken entirely away from the court, and conferred upon the triers; and hence it is, doubtless, on this occasion, that the challenge, instead of being to the favor, as it was on the former trial, and submitted to the sound discretion of the triers, assumes the form of a principal challenge, and is submitted to

the court, who are bound to apply to it the strict rule which has thus been deliberately established by the superior tribunal for its government.

To apply the rule to the case in hand: Even if I should be clearly of opinion that the juror challenged would make a fair and impartial juror, upon what principle should I be justified in overruling the challenge? Because his opinion is not fixed and decided? That is held not to be necessary. Because it is not founded in a belief of the facts out of which it has arisen? That is ruled not to be an essential ingredient. Because it is founded on an imperfect knowledge of the facts of the case? The court, in *Mather's case*, held that to be a better reason for excluding the juror than even if he had enjoyed all the knowledge that he might have obtained as a grand juror. Because the juror may think himself competent to serve, notwithstanding the impressions made upon his mind? The Supreme Court, in *Mather's case*, also held that, even if he is sincerely determined to discard his prejudices, he is not to be received, because the law does not hold him capable of doing so.

There is, therefore, no aspect in which I can present the case, in which I can overrule the challenge without running counter to the decisions of the Supreme Court.

If the question were submitted to the triers, they might exercise a sound discretion; but the prisoner has a right to withdraw it from their consideration, and submit it to the determination of the court; and when so submitted, I am not at liberty to exercise any discretion. All control over the matter is taken away from me; I am bound down by the rules which have been established for my guidance, and I am constrained, however I may deprecate the consequences, to allow the challenge.

After the attempt to obtain a jury had been protracted nearly three weeks, and about four thousand jurors had been examined and only ten had been impaneled, the counsel for the prisoner stated, that now that a reasonable effort to obtain a jury had failed, and as the state of public opinion, as

disclosed by the examination of the jurors, justified them in believing that the difficulties in obtaining a jury were on the increase, they moved the court to suspend the trial and discharge the jury, and grant them the necessary certificate to lay before the Supreme Court, in order to procure a change of venue.

*Clark, District Attorney*, said that the counsel for the prosecution would offer no objection, as they were convinced of the futility of the efforts to get a jury in that county.

*The Circuit Judge* granted the motion.

[The venue was afterward changed to the county of Orange, where the prisoner was tried and acquitted of the charge of murder. *Nolle prosequis* were then entered on the other indictments and she was set at liberty.]